Filed 1/5/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re WILLIAM JIM MORSE on  Habeas Corpus. | D077483  (Super. Ct. No. EMH-000347) |

Petition for Writ of Habeas Corpus.  Jeffrey Bruce Jones, Judge. Petition denied.

Benjamin Salorio, Public Defender, Darren Bean, Deputy Public Defendant for Petitioner.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Joy Utomi, Deputy Attorneys General, for Real Party in Interest.

William Jim Morse petitions for a writ directing the superior court to reverse its finding under the Sexually Violent Predators Act (Welf. & Inst. Code,[1] § 6600 et seq.) (SVPA) that there is probable cause to believe petitioner is likely to engage in sexually violent predatory behavior without treatment or custody.  The court during the section 6602 probable cause hearing sustained petitioner's objection based on *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) to portions of the experts' psychological evaluations,

---

[1]     Unless noted otherwise, all further statutory references are to the Welfare and Institutions Code.

but nonetheless found the remaining evidence was sufficient to support a finding that petitioner met the criteria of a sexually violent predator (SVP).[2]

At the probable cause hearing, a court must "review" the SVP petition. (See § 6602, subd. (a).)  The petition, in turn, must be supported by statutorily mandated evaluations that in some, if not most, cases rely on a broad array of sources dating back years, if not decades, that an evaluator *must* consider under the SVPA as part of his or her standardized assessment of a person.

Petitioner argues that the court correctly found *Sanchez* applied at the probable cause hearing; that, after sustaining his hearsay objection to the experts' evaluations, there was insufficient evidence to support the court's probable cause finding; and that the People "waived" their right to assert section 6602 is an implied exception to the hearsay rule by failing to raise this specific ground at the hearing.  Petitioner therefore argues the petition must be dismissed.

As we explain, we conclude the court erred in sustaining petitioner's hearsay objection at the section 6602 hearing.  We find the SVPA as a whole, and section 6602 in particular, evince a legislative intent to allow a court to consider hearsay in the experts' evaluations when making a probable cause determination.  In our view, requiring an evaluator to rely on nonhearsay only in preparing his or her evaluation of a person, or requiring the People to produce at an interim probable cause hearing independent foundational

---

[2]    A " 'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."  (§ 6600, subd. (a)(1).)

evidence to support the historical information relied on by evaluators, would undermine the purpose of such a hearing and the SVPA in general.

Our decision finds further support in that a person at a section 6602 hearing is afforded various procedural safeguards, including the assistance of counsel, the right to cross-examine the evaluators and challenge their findings, and the ability to call witnesses.

We note, however, that our decision is limited to a section 6602 probable cause hearing. At an SVP trial, the People must still proffer nonhearsay evidence in proving beyond a reasonable doubt that a person is an SVP subject to civil commitment.

In light of our decision, we conclude there is ample evidence in the record to support the court's probable cause finding. We thus deny petitioner's writ petition.

OVERVIEW

On February 20, 2020, the El Centro District Attorney filed a petition to commit petitioner as an SVP. The petition was supported by the evaluations of psychologists Erik Fox and G. Preston Sims. In connection with their evaluations, the doctors reviewed petitioner's background, criminal, prison, and mental health records, and records of the qualifying sexual offense. Petitioner refused to be interviewed by Dr. Fox; he thus completed his evaluation by relying on about 39 sets of documents, which he identified, including dates, in his evaluation.

Petitioner did agree to an interview with Dr. Sims, who also reviewed voluminous records identified in his evaluation. The doctors in their evaluations concurred that petitioner met the definition of an SVP as provided under the SVPA.

*Qualifying Sexually Violent Offense*

As described in the doctors' evaluations,[3] petitioner's February 2012 Imperial County Probation Report (sometimes, probation report) noted deputies on January 24, 2010, responded to a physical altercation in a trailer park where petitioner was then living. Deputies contacted petitioner and discovered he had been hiding in the bedroom closet of seven-year-old[4] Jane Doe. Petitioner claimed while hiding he heard Jane Doe's 16-year-old cousin asking to be orally copulated by Jane Doe, and saw him exposing his penis to his cousin. Petitioner further claimed he confronted the cousin and a fight ensued.

Deputies searched petitioner's RV positioned adjacent to the victim's residence. Inside the RV deputies found "images of child erotica, notebooks with handwritten text discussing child sex and an intention to engage in sex with children, literature discussing sex with children in foreign countries, and baby dolls with red paint on their vaginal areas."

According to the probation report, deputies on February 10, 2010, interviewed Jane Doe's mother. She disclosed she had met petitioner about two months earlier, he was the caretaker of the trailer park, and an acquittance of her boyfriend. She also disclosed petitioner had given her daughter "underwear and toys"; he had "frequently followed her daughter around"; and her daughter had reported petitioner "touched or tickled her in the underwear area."

---

3     The documents relied on by the evaluators are not included in the appellate record. We thus cite to the evaluations in summarizing the facts of petitioner's qualifying sexual offense and the other information relied on by the experts in determining petitioner met the criteria of an SVP.

4     Dr. Fox in his report stated Jane Doe was seven years old, whereas Dr. Sims stated she was six years of age.

On February 23, Jane Doe was taken to the Chadwick's Children Center for a forensic interview. The probation report notes the following statements were then taken: "Jane Doe said she was watching Strawberry Shortcake when the defendant entered her room. He sat next to her on the bed and placed his hands on her upper/inner thigh. Jane Doe said she was scared and told her mother. On a separate occasion, Jane Doe said she was taking out the trash when the defendant began chasing after her. Jane Doe said she was very scared. Jane Doe further said that the defendant had given her a doll that had a hole on the 'private parts' area. On one occasion, he kissed the victim's doll on the vaginal area. The victim said the defendant repeatedly attempted to take her to the beach and had given her underwear and a Sea World towel. The victim lastly said that the defendant had attempted to kiss her. Jane Doe reiterated that she was afraid and did not like him at her house."

Although charged with multiple counts, petitioner pleaded guilty to a single count of committing lewd acts upon Jane Doe, a child under the age of 14. (Pen. Code, § 288, subd. (a).) The court sentenced petitioner to 12 years in prison.

*Dr. Fox's Evaluation*

Dr. Fox opined that petitioner's conviction under Penal Code section 288, subdivision (a) qualified as "sexually violent offense" under section 6600,

subdivision (b).[5]  Dr. Fox also opined that petitioner has a diagnosed mental disorder that predisposes him to the commission of criminal sexual acts. (§ 6600, subd. (a)(1).)

With respect to his latter finding, Dr. Fox reviewed petitioner's psychological history.  Dr. Fox noted there was limited information on this subject matter.  Dr. Fox cited to a Clearwater, Florida supplemental police report from 1995 in which petitioner had been arrested for kidnapping and false imprisonment of a nine-year-old child.  Subsequent to his arrest, petitioner's mother was interviewed by an investigating officer.  She stated petitioner had a "long history of drug related problems" that led her to "kick" petitioner out of the house on several occasions.

Dr. Fox also addressed petitioner's educational, employment, relationship, and psychosexual history, as set out in the probation report. This history shows petitioner completed the ninth grade; served in the United States Army for three years[6]; and had at least four children.  Dr. Fox noted the probation report provided some background information regarding petitioner, including about his father who died in combat while serving in the United States Army, and about his mother, who died in 2010.

---

[5]    As relevant here, a " 'sexually violent offense' means the following acts when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person, and that are committed on, before, or after the effective date of this article and result in a conviction or a finding of not guilty by reason of insanity, as defined in subdivision (a):  a felony violation of Section . . . 288 . . . of the Penal Code . . . ."  (§ 6600, subd. (b).)

[6]    Petitioner stated during his interview with Dr. Sims that he served one year in the Army and then left because his mother had health problems.

Regarding petitioner's psychosexual history, Dr. Fox in his evaluation noted there also was a dearth of information on this subject matter, particularly as a result of petitioner's refusal to submit to a clinical interview. Dr. Fox noted the probation report provides evidence that in the qualifying crime petitioner attempted to "groom" Jane Doe; that Jane Doe's mother was often intoxicated, making the victim "particularly vulnerable"; and that the Facts of Offense Sheet dated February 14, 2012 listed the titles of videos petitioner had in his possession at the time of the qualifying crime. These titles included: " '6-9 years. Girls Fuck. Little Cunts. Fucked by big daddy. Rape little girl.' '5 mins. Russia. 7 yo Fucked by Daddy.' 'Hot little vaginas from Germanyu. 4-6 yrs—raped by 2 daddies.' Thailand-Bankok babes—pretens 5 yrs, 6yrs. Hot 8 yrs old getting pussy fucked by old dude.[ ] etc. . . ."

Dr. Fox described an incident from the probation report that took place after petitioner had been arrested for the qualifying crime. An undercover agent from Immigration and Custom Enforcement was placed in petitioner's Imperial County Jail cell because authorities were concerned by petitioner's "intent to access child pornography and have sex with children in foreign countries." The agent befriended petitioner; they had a number of conversations about child pornography and sex with children; and petitioner agreed to purchase child pornography videos from the agent on petitioner's release.

After making bail, petitioner went to the agent's motel room to purchase the videos. The probation report, relied on by Dr. Fox, noted a hidden camera and microphone in the motel room recorded the following: " '. . . [T]he pornographic videos contained images of a "ten-year-old getting fucked by a dog," a five year-old "Brazilian bitch being raped by a man with a cock the size of fuckin Great Dane" and a little girl getting her "cherry

7

popped." [The undercover agent] said he would sell the videos to him for $100. The defendant said $100 was a significant amount and that he needed a preview before purchasing them. He then told [the undercover agent] he would purchase his toiletries from [a department store] in exchange for the videos. On February 1, 2012, he eventually paid [the undercover agent] $50 for the videos.'

"The defendant made several alarming statements such as . . . 'I fucked my own mother,' 'My daughter sucked my dick when she was like eight years old,' and 'I will protect fucking people that are like me. All my fucking life I knew I wasn't the only one, the only so-called fuckin molester or the only fuckin pervert.' The defendant added a pimp in Ciudad Juarez, Mexico had given him a child and that children commonly went for $400. [The undercover agent] suggested that they travel to Mexico to have sex with children. Enthused by the idea, the defendant invited himself and began to plan the trip. He said they needed to have a 'business plan.' The defendant said he was seeking more than sex and wanted a 'real relationship' with a[n] 11 year-old. Once he would 'fuck' her, nobody could touch her, he said. The defendant said he needed to give the children's mother[ ] money to calm down the children. Therefore, they drove to [a location] to access a [bank's] automatic [teller] machine; the defendant withdrew $800. Officers subsequently arrested him in the parking lot."

Dr. Fox noted petitioner was accused of molesting another victim, who came forward on April 8, 2010. Dr. Fox's evaluation referenced an April 8 El Centro Police Department Narrative regarding this incident, which was summarized in the probation report. The probation report noted criminal charges from this incident, involving a six-year-old girl in which petitioner

8

was accused of molesting and grooming the victim, were dropped as part of petitioner's guilty plea to the qualifying crime involving Jane Doe.

The probation report nonetheless provided details regarding this separate incident.[7] The victim reported to her father that petitioner "touched her vagina, that his penis entered her vagina[ ] and that it hurt her. The victim confirmed it was Mr. Morse who molested her and remarked that he bought her toys. An El Centro Police Department Investigation Report dated 5-9-11 also indicates the victim stated Mr. Morse placed his mouth on her 'peepee' for a long time while inside Mr. Morse's recreational vehicle."

Dr. Fox noted that while petitioner was incarcerated in 2011 at the Imperial County Regional Adult Detention Facility, deputies during a routine inspection found papers in petitioner's cell that "contained writing and drawings that appeared to be of female children in various states of undress and provocative poses." Dr. Fox reviewed the drawings and reported one of the drawings "displays a female with her legs spread open and a caption of her saying, 'Fuck me hard daddy!' Underneath the image is the quote, 'Seems he has a daughter that just loves to fuck.'" Other writings on the papers included, " 'Little girls inside of blacked out minivans in Lost Angelles Cal. Arcade Fun.' "

In 2012, while in prison for the qualifying crime, deputies discovered a number of contraband pictures while searching petitioner's bed area. Dr. Fox noted there were seven small pictures depicting "various dolls and very young girls who looked between the ages of 4 and 7."

Dr. Fox described an incident in 2015 when an inmate complained petitioner was creating " '[d]isgusting drawings of children and cartoon

---

7    As discussed *post*, Dr. Sims questioned petitioner about this incident during the forensic interview.

9

characters showing their private parts.' " The source of the report is not given by Dr. Fox. Dr. Fox went on to note that shortly after the inmate complained, there was a physical altercation between petitioner and other inmates. Dr. Fox added, "I found no other mention of the child sexual material but given the history of such, it seems plausible Mr. Morse was creating it again."

Dr. Fox also addressed an incident in February 2019 when petitioner walked across the prison yard "completely naked." Dr. Fox did not provide a source of this information. Dr. Fox in his evaluation noted petitioner claimed to have done so for attention because he was fearful as a result of being a convicted sex offender.

Dr. Fox listed petitioner's adult criminal history, which is extensive dating back to 1982, and includes petitioner's 1995 conviction in Florida for false imprisonment of a nine-year-old child, as briefly noted *ante*. The criminal history also includes a section on petitioner's "Institutional Behavior," which recounted more than 10 violations while petitioner was incarcerated for the qualifying crime, including the February 2019 incident when petitioner walked across the prison yard naked.

The evaluation also includes petitioner's substance abuse, medical, and psychiatric history. Regarding the latter, among other details Dr. Fox stated the probation report noted petitioner admitted to being diagnosed with schizophrenia at the age of 10. According to Dr. Fox, petitioner's medical records, including an IEX report dated March 4, 2019, "reveal Mr. Morse is diagnosed with a number of mental disorders including Bipolar Disorder, Antisocial Personality Disorder, and Pedophilic Disorder."

When Dr. Fox briefly met with petitioner and attempted to conduct a forensic examination, petitioner then was in custody in the Mental Health

10

Crisis Bed level of care, which Dr. Fox opined was "similar to an acute inpatient psychiatric hospitalization." Shortly thereafter, petitioner was transferred to an "Intermediate Care Facility" because, Dr. Fox further opined, petitioner needed a "higher level of care . . . than that which the prison can provide."

Dr. Fox reviewed petitioner's Clinical Summary and Case Formulation dated August 21, 2019, which described petitioner's psychiatric treatment history, most of which was from his incarceration for the qualifying offense. From this information, and other records summarized *ante*, Dr. Fox concluded that petitioner "has not been stable psychiatrically for some time"; that he is "court ordered to take psychiatric medication involuntarily which highlights his lack of treatment compliance"; that petitioner's antipsychotic mediation therefore was being "administered intramuscularly"; and that he suffers from auditory hallucinations and paranoid thoughts, as also documented in progress notes from 2018 by the Mental Health Services Delivery System, where petitioner again admitted to being schizophrenic.

Based on his review of these extensive records, Dr. Fox opined under the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5), that petitioner's has the following diagnostic profile: "302.2 Pedophilic Disorder, Non-Exclusive Type, Sexually Attracted to Females"; "305.00 Alcohol Use Disorder, Mild"; "305.20 Cannabis Use Disorder, Mild"; "305.60 Stimulant Use Disorder, Cocaine, Mild"; and "298.8, Other Specified Schizophrenia Spectrum and Psychotic Disorder."

Regarding his diagnosis of pedophilic disorder, Dr. Fox noted the DSM-5 lists the criteria of this disorder as follows: "A. Over a period of at least six months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children

11

(generally age 13 years or younger). [¶] B. The individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty. [¶] C. The individual is at least age 16 years and at least five years older than the child or children in Criterion A."

Dr. Fox opined that petitioner met the above criteria, noting his prepubescent victims, including Jane Doe, were only six or seven years of age. Dr. Fox continued, "The evidence shows he groomed each of these vulnerable children and had written about his desire to have sex [with] children. Further evidence of his sexual interest in children is noted by officers who confiscated child pornography from his vehicle after his arrest in 2010. Then, after detection for molesting the 7-year-old victim [Jane Doe], Mr. Morse befriended a cellmate who he later purchased child pornography from. He then made arrangements to have sex with children in Mexico. Mr. Morse also disclosed he had forced his 8-year-old daughter to orally copulate him. The cellmate was actually an undercover agent. Later in 2011, 2012, and 2015 while in custody, Mr. Morse was in possession of images and writings he created regarding sexual interest in children. Consequently the timeline for the disorder is met. Mr. Morse has obviously acted upon his urges and the age requirements are established. Mr. Morse's incarceration has caused him obvious marked distress and interpersonal difficulty. The criteria for Pedophilic Disorder are met." Dr. Fox then went on to address the remaining disorders discussed *ante*.

Dr. Fox opined petitioner suffers from a "diagnosed mental disorder" as defined in subdivision (c)[8] of section 6600, as Dr. Fox found there was a

---

8     " 'Diagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

"direct nexus between [petitioner's] pedophilic disorder and his lack of volitional control." Dr. Fox added: "First, despite detection and sanction, Mr. Morse immediately sought out child pornography to replace what had been confiscated. He then made plans and took steps to engage in sex with a child in Mexico. Thereafter, while incarcerated, he created images and writings to support his deviant sexual interests despite the fact that possession of such material imposed a significant danger to his safety. It is therefore clear his behavior is not deterred by actual consequences. In Mr. Morse's case, he is also emotionally impaired as a result of his pedophilic disorder. His statements and actions establish that he fails to recognize the significant psychological consequences to his victims."

Dr. Fox further opined that without appropriate treatment and custody, petitioner was likely to engage in sexually violent criminal behavior as a result of his mental disorder. In reaching this conclusion, Dr. Fox relied on the Static-99R, scoring it "in the most conservative manner" by not including any incident involving a stranger or any male victims. Dr. Fox found petitioner was in the above average risk category for being charged or convicted of another sexual offense. Dr. Fox's evaluation discussed at length absolute recidivism rates, as well as the structured risk assessment known as the violence risk scale—sexual offense version (VRS-SO), and a variety of dynamic factors under this assessment tool.

Dr. Fox went through 17 different factors relative to the VRS-SO. He found petitioner's overall lifestyle is characterized by sexual deviance, including grooming at least two of his victims; possessing child pornography; discussing his sexual history with children with an undercover agent; acquiring more sexually deviant material from that agent; and making plans to travel abroad to have sex with children. Dr. Fox also found that petitioner

13

in 2010 planned his sexual crime, another factor, by grooming Jane Doe and the other young victim.

Other factors present in the VRS-SO included petitioner suffers from some "cognitive distortions"; he "extensively or consistently" uses aggressive behaviors "in interpersonal interactions"; he lacks community support if released; if released, he will be at risk even on parole given his "thought disorder, poor medication compliance, substance abuse history, and limited resources"; he is unwilling to comply with community supervision, as he was on such supervision when he sexually assaulted Jane Doe, purchased child pornography, and made arrangements to have sex with children in Mexico; and he exhibits deviant sexual preference, as he showed a consistent and marked interest in children and was diagnosed with a paraphilia.

Dr. Fox found various case-specific factors also supported his conclusion that if untreated, petitioner was likely to engage in sexually violent criminal behavior as a result of his mental disorder. Dr. Fox noted the depth and persistence of petitioner's paraphilic disorder was "quite significant," as petitioner's victims were vulnerable and he was willing to travel outside of the country to serve his sexual deviance. Dr. Fox thus found these factors set petitioner apart "from the typical, average, or routine pedophile" who, according to Dr. Fox, tend not recidivate, unlike petitioner who sought to do so while out on bail for the qualifying crime.

Dr. Fox next reviewed various factors that may mitigate the risk of sexual recidivism by petitioner. Dr. Fox found none applied.

14

Dr. Fox also concluded petitioner's qualifying crime was "predatory," as defined in section (e)[9] of section 6600. Dr. Fox noted Jane Doe was at most a casual acquaintance, and petitioner only briefly knew his other victim. Dr. Fox also noted both relationships were promoted for the primary purpose of sexual victimization. As such, he concluded any future sexual offenses committed by petitioner were likely to be predatory in nature.

Dr. Fox also discussed alternate sex offender treatment programs available to petitioner. After assessing various factors, Dr. Fox concluded that if paroled, community-based voluntary treatment for petitioner would be "insufficient." Dr. Fox therefore concluded petitioner met the criteria of an SVP under section 6600, subdivision (a)(1).

*Dr. Sims's Evaluation*

Dr. Sims's interviewed petitioner for one hour and 20 minutes in connection with his November 5, 2019 evaluation. Dr. Sims also reviewed 41 sets of documents from the Department of State Hospitals (DSH); myriad rules violation reports from petitioner's medical file generated by the R.J. Donovan Correction Facility; and petitioner's mental health documents dated May 3 to October 30, 2019. Dr. Sims concurred with Dr. Fox that petitioner's 2012 conviction involving Jane Doe, case No. JCF25010, was a "sexually violent offense" under section 6600, subdivision (b). Dr. Sims noted the case information showed petitioner had been charged with five counts and he had pleaded guilty to count 1, with the remaining counts being dismissed under the plea.

---

9 " 'Predatory' means an act is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6600, subd. (e).)

Dr. Sims's evaluation, like Dr. Fox's, relied extensively on petitioner's February 2012 probation report. Dr. Sims's factual summary of the qualifying sexual offense is thus similar to Dr. Fox's summary, described *ante*. Dr. Sims's evaluation, however, included additional information as follows: "On February 14, 2012, the undersigned (probation officer) interviewed the defendant at Imperial County Jail. Upon introducing myself, the defendant immediately asserted, 'I didn't do these crimes' and that he had pled to the instant offense since he had to two prior strikes. He added, 'I got railroaded into taking a guilty plea.' The defendant said the incident report had numerous inconsistencies and he referred to police officers as 'dirty mother fuckers.' When asked to explain his relationship to the victim, he asked which one of the two victims. The defendant said he was a friend to both victims. When referring to Jane Doe, he said he cared for her when the mother was sick drunk [sic]. The defendant said he often had dinner at Jane Doe's house and would have a few beers with her mother. He said he was living with the other victim's mother, who was pregnant, and that he had helped care for her children. Later, he was accused of molesting her seven-year-old daughter. He denied engaging in sexual contact with either victim."

Dr. Sims during the clinical interview asked petitioner about the incident involving Jane Doe. Petitioner responded he did not remember. When Dr. Sims reminded petitioner he was sentenced to 12 years in state prison for this offense, petitioner stated the incident was " 'erroneous,' " and added he had "[o]ral copulation with a Child Under 13 years."

During the interview, petitioner was also asked about the incident involving the six-year-old girl, in which charges were brought then dropped in return for his guilty plea to the qualifying offense. Petitioner responded,

16

"I was intoxicated and high on medication." When Dr. Sims's questioned petitioner what effect the sex offense may have had on the little girl, petitioner replied, "I doubt it. It was something she was used to."

Dr. Sims concurred with Dr. Fox that petitioner's conviction under Penal Code section 288, subdivision (a) for the offense on Jane Doe met the definition of a "sexually violent offense" under section 6600, subdivision (b). Dr. Sims also concurred with Dr. Fox that petitioner has a diagnosed mental disorder affecting his emotional or volitional capacity that predisposes him to the commission of criminal sexual acts. Similar to Dr. Fox's evaluation, Dr. Sims reviewed petitioner's background, educational, employment, relationship, and sexual history.

In the interview, petitioner told Dr. Sims that both his parents were deceased; that he had three brothers; that he was physically and emotionally abused by his step-father from age 11 to 13; that he joined the Army when he was 18 years old, but left after one year because his mother had health problems; that while in the Army he was sexually abused by two soldiers; and that also while in the military he was in a coma for 28 days after being "hit in the chest by a cannon shell."

After discussing his relationship history in which petitioner claimed he had five children living in Arizona and one in Ohio, all living with women other than the two he had previously been married to, he talked about his sexual history. When asked how often he thinks about children in a sexual way, petitioner initially responded, "[O]nce in a blue moon. I don't know," then contradicted himself and said, "No." Petitioner also denied having any other type of "sexual problems" or "sexual deviancy."

Petitioner also discussed his alcohol and drug use during his interview with Dr. Sims. When asked if he had any problems with alcohol or drugs,

17

petitioner stated, "Currently, no. If I get out, I'll have to join a treatment program because I still have 'stinking thinking.' I can drink a 12-pack or smoke marijuana—it's legal, but I want to be more functional."

Dr. Sims also referenced the 1995 incident in Florida in which petitioner was convicted of kidnapping. Dr. Sims wrote: "According to the police report, the defendant contacted a nine-year-old girl walking on the street (he reports he thought the girl victim was a boy) and coerced her to stay with him when she was to return home. When contacted by police, he lied and stated that 'he' was with him (the defendant). The child confirmed the lie. When the police searched for them later, the defendant forced the child into a dumpster to avoid contact. They were found and the child was returned home the same day of the abduction."

Dr. Sims also discussed the qualifying crime. Dr. Sims noted after deputies contacted petitioner on January 25, 2010, they searched his RV and found "[s]everal alarming items" that were "confiscated," as summarized *ante* in connection with Dr. Fox's evaluation.

Regarding the incident in the Imperial County Jail when authorities placed an undercover agent in petitioner's jail cell, discussed *ante* in Dr. Fox's evaluation, Dr. Sims further noted the probation report described the following interview after petitioner's arrest with respect to his purchase of child pornography from the agent: "[T]he defendant said that while in jail, he had met with [an individual allegedly named] Don Ramon, a man interested in child pornography and child sex. He said he wanted to entrap Don Ramon and thus posed as a pedophile. Since he wanted Don Ramon arrested, he purchased child pornography from him for $50. He further said he had led Don Ramon to believe that he would travel to Mexico in order to witness more of Ramon's criminal acts. In reference to the journals in his RV, he said

18

he knew a few child molesters in Ocotillo and was planning to infiltrate by pretending to be one of them. The defendant denied having sex or sexual desires towards children. Agents made inquiries as to his initial arrest [on the qualifying crime]. The defendant said he was hiding from a biker in the child's room and [he] witnessed a 16-year-old attempt to molest a child. He said the child's mother was asleep, leaving the child unprotected in her bedroom."

Dr. Sims asked petitioner about the incident involving "Don Ramon." Petitioner responded, "An undercover cop tried to sell me child porn. I told him, 'I don't know you. I don't know what the DVDs are about, but I could use a ride to Ocotillo.' All they were trying to do was hook me on a case."

Petitioner during the forensic interview also made a "vague reference to another sex offense against a separate victim." Petitioner told Dr. Sims, "There is one they didn't indicate. It was nothing to do except me being drunk. . . . It was a friend I was babysitting. Her mom would get drunk. It was in Ocotillo, California."

Dr. Sims, as did Dr. Fox, also reviewed petitioner's rule violation reports during petitioner's incarceration on the qualifying offense. Dr. Sims asked petitioner about an incident that occurred in February 2019, when petitioner was arrested and taken to the mental health delivery system building after walking naked across the prison yard. Petitioner stated, "They wouldn't listen."

Dr. Sims reviewed petitioner's extensive psychiatric history dating back to 1981. Although petitioner claimed to have left the Army due to his mother's health, Dr. Sims noted while petitioner was serving in the military he had a nervous breakdown and was discharged. Dr. Sims also noted that petitioner in December 2002 was admitted to Patton State Hospital after

19

being found incompetent to stand trial. The Discharge Summary dated February 23, 2005 relied on by Dr. Sims showed petitioner previously had been diagnosed as schizophrenic. An August 20, 2010 Patton State Discharge Summary noted petitioner attempted to "lure" one of his female peers into the mail bathroom, but was stopped by staff. He also was observed holding hands with female peers and "appeared to engage in many behaviors indicating he was looking for some erotic satisfaction on the unit."

Dr. Sims also included in his evaluation Mental Health Documentation dated October 26, 2019. Dr. Sims noted these records showed petitioner had attempted suicide at least 10-plus times; and had experienced auditory hallucinations, paranoia, disorganization, and mood swings. Dr. Sims also reviewed and summarized health records of petitioner from R.J. Donovan Correctional Facility.

Dr. Sims asked petitioner about his psychiatric history. Dr. Sims summarized their conversation as follows: "Mr. Moore stated that he had been hospitalized at Atascadero State Hospital 'a number of times.' He stated, 'I'm not schizoaffective. I think I'm schizophrenic. I don't have manic episodes.' He stated that he has auditory hallucinations 'at times.' He denied having paranoid thoughts. He stated that he currently takes lithium and valproic acid, but 'I don't notice a difference.' " Petitioner during the interview admitted several previous suicide attempts, "including breaking a razor off in his arm in 2016, drinking gasoline on the yard in 2016 and taking someone else's medications in a suicide attempt, also in 2016."

When asked to access his risk for sexual re-offense, petitioner told Dr. Sims "zero." When asked why this was case, petitioner replied, " 'because I'm going to get alcohol treatment. After 12 years of reflection, there's no way

20

that I would do the same thing.'" Petitioner then denied needing any treatment for "sexual offense behavior."

Based on the foregoing, Dr. Sims diagnosed petitioner using the DSM-5 as follows: "302.2 Pedophilic Disorder, Sexually Attracted to Females, Non-exclusive type"; "295.70 Schizoaffective Disorder, Depressive Type"; "303.90 Alcohol Use Disorder, Severe, in a controlled environment"; and "301.7 Antisocial Personality Disorder."

Dr. Sims used the same criteria from the DSM-5 used by Dr. Fox regarding the diagnosis of Pedophilic Disorder. Dr. Sims concluded petitioner met the criteria, explaining: "Mr. Morse has been reported to view child pornography repeatedly, to engage in sexual activity with a 6-year-old and to make comments regarding his sexual interest in children, such as 'My daughter sucked my dick when she was like eight years old,' and 'I will protect fucking people that are like me. All my fucking life I knew I wasn't the only one, the only so-called fucking molester or the only fucking pervert.'"

Dr. Sims found his diagnosis of Schizoaffective Disorder was warranted because petitioner's "[p]ast symptoms have included auditory and visual hallucinations, bizarre delusions, paranoia, grandiosity, extensive mood swings with depression and mania, aggressive and assaultive behavior and extremely disorganized thinking." Dr. Sims also found support for this diagnosis because petitioner previously had been diagnosed with schizophrenia, as he admitted during the interview, and because of his history of at least 10 suicide attempts.

Dr. Sims then reviewed the factors from the DSM-5 and petitioner's history to diagnose him with Alcohol Use Disorder. Dr. Sims also used the criteria from the DSM-5 to explain his diagnosis of Antisocial Personality Disorder. Dr. Sims explained: "Mr. Morse's failure to conform to social

21

norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest . . . indicated in hi[s] approximately 31 arrests and approximately 20 convictions. His deceitfulness is indicated in his false imprisonment conviction, in his reporting the death of his mother on numerous occasions and in his report that he was posing as an FBI agent to entrap 'Don Ramon.' His impulsivity and failure to plan ahead is indicated in his alcohol abuse and parole and probation violations. His irritability and aggressiveness and reckless disregard for the safety of others was indicated in his arrests and convictions for Battery on Person, Assault with a Deadly Weapon, Attempted Murder, Child Cruelty and Lewd Act Upon Child. His consistent irresponsibility is indicated in his sporadic work history and failure to support five children. His lack of remorse was clearly evident in the current interview."

Dr. Sims also concluded petitioner has a mental disorder affecting his volitional and emotional control that predisposes him to the commission of criminal sexual acts. Dr. Sims based his conclusion on petitioner's diagnoses of Pedophilic Disorder, Schizoaffective Disorder, Alcohol Use Disorder, and Antisocial Disorder which, when combined, produce such a condition. Dr. Sims found that this condition created a "volitional impairment" in light of the repetitive nature of petitioner's sexual offenses, "despite the potential of being caught and sanctioned"; and that petitioner repeatedly engaged in such sexual acts "despite the victims' discomfort/distress," evidencing the condition affected his emotional capacity. Dr. Sims thus opined petitioner met the definition of "diagnosed mental disorder" under section 6600, subdivision (c).

Dr. Sims also opined that absent treatment or custody, petitioner was likely to engage in sexually violent criminal behavior as a result of his diagnosed mental disorder. Dr. Sims found that petitioner's scores based on

the Static-99 and Static-2002 placed him in the average risk category for being charged or convicted of another sexual offense. Dr. Sims nonetheless found these scores did not include psychological risk factors, which, when considered, supported his finding petitioner in the future was likely to engage in sexually violent criminal behavior.

Focusing on the factors of the structured risk assessment—forensic version, Dr. Sims found the factor for sexual preference for children applied to petitioner, as Jane Doe was under 14 years of age, and petitioner in the past has "expressed an interest in sexual activity with children in his statement [to] the undercover agent and his purchasing the alleged child pornography at that time." Other factors found present, or partially present by Dr. Sims included petitioner's sexual preoccupation beyond that considered "normal" for an adult; his emotional congruence with children; his callousness and lack of empathic connection with others; his grievance thinking based on poorly managed anger and a "persistent pattern of verbal aggression, angry outbursts, threatening and intimidating behavior"; his lifestyle impulsivity, demonstrated by his "sensation-seeking and poor tolerance for boredom"; his resistance to rules and supervision; and his dysfunctional coping.

Based on these factors, Dr. Sims opined that petitioner's score on the structured risk assessment—forensic version, was 33, which "placed him at a 'high' level of psychological need."

Dr. Sims also considered protective risk factors. He found the risk of reoffense by petitioner may be reduced as a result of petitioner's chronic pain. However, Dr. Sims found other protective risk factors, such as completing a comprehensive sex offender treatment program or having been in the community without sexually reoffending, did not apply to petitioner.

23

Dr. Sims also evaluated not only whether it was "likely" petitioner would sexually reoffend, but also whether such an offense would be "predatory" in nature as defined in section 6600, subdivision (e). Dr. Sims opined that if petitioner does sexually reoffend, it will likely be predatory given his offense against Jane Doe, who was merely a "casual acquaintance" with whom petitioner had no substantial relationship.

Based on all of the foregoing, and despite petitioner's Static-99R and Static-2002R scores, Dr. Sims concluded petitioner "represents a substantial danger, that is, a serious and well-founded risk of committing a future violent sexual offense. Therefore, . . . he is likely to engage in sexually violent predatory criminal behavior as a result of his diagnosed mental disorder without appropriate treatment and custody."

*SVP Petition, the Probable Cause Hearing, and the Writ Petition*

As noted, the El Centro District Attorney filed a petition in February 2020 to commit petitioner as an SVP. The petition was supported by the evaluation of Drs. Fox and Sims, which were attached to the petition. In April 2020, the court held a probable cause hearing under section 6602. The People did not call any witnesses, and submitted on the evaluations of the two doctors. The petitioner also did not call any witnesses.

Relying on *Sanchez* and *People v. Superior Court* (*Couthren*) (2019) 41 Cal.App.5th 1001 (*Couthren*), petitioner at the hearing objected to the evaluations on the ground they presented facts based on case-specific hearsay. Therefore, petitioner argued the experts' opinions lacked proper foundation and the petition should be dismissed. The court sustained the objection.

However, after sustaining the objection, the court found there was sufficient admissible evidence to support the finding that petitioner "is a

24

person that would fall under the SVP law." In making this finding, the court noted the qualifying offense involving Jane Doe was a "sexually violent offense" as defined under section 6600, subdivision (b).

The court then turned to the other requirements of the SVPA and found they too were satisfied, noting: "[E]ven with the objection being sustained, there's sufficient evidence in the file to support the opinion that the qualifying crime was predatory in that even Mr. Morse was stating to the interviewer—and that's not hearsay at that level—that the child was a neighbor kid and that, you know, certain statements about the child's mother and her behavior and that sort of thing. So there's probable cause.

"I'm not saying any further burden of proof than that. But there's probable cause to believe that it was predatory in nature. Mr. Morse acknowledged to the interviewer that he did at least have schizophrenia.

"He doubted that he had schizoaffective disorder. But that's a mental disorder and, therefore, the interviewer or the author of the report [i.e., Dr. Sims], which was submitted [to the court] on April the 15th, had sufficient basis for the opinion that he suffers from a mental disorder that makes it likely that he will commit sexually violent acts in the future, at least as a probable cause standard."

On May 12, 2020, petitioner filed a writ petition. The People on June 25 filed an informal response, and Petitioner on July 8 filed a reply to that response. On July 14, this court ordered the People to show cause why the relief sought in the petition should not be granted. The People responded by filing a return on August 6, and the petitioner filed a traverse on September 8.

DISCUSSION

As noted, petitioner contends the court impermissibly relied on hearsay, including his interview statements to Dr. Sims and, despite sustaining his objection under *Sanchez*, to other case-specific facts in the evaluations in making its probable cause finding. Absent this inadmissible hearsay, he contends there is insufficient evidence to support the probable cause finding; and therefore, the petition must be dismissed.

Currently, there is a split in the Court of Appeal whether an evaluation based on case-specific facts from hearsay sources is admissible at a section 6602 probable cause hearing to establish a person may be an SVP. (*Couthren*, *supra*, 41 Cal.App.5th 1001 [inadmissible]; *Bennett v. Superior Court* (2019) 39 Cal.App.5th 862 (*Bennett*) [same].) This issue is now pending before our high court. (*Walker v. Superior Court* (2020) 51 Cal.App.5th 682 (*Walker*) [admissible], review granted September 9, 2020, S263588.)

A. *Statutory Overview*

The SVPA "allows for the involuntary commitment of certain convicted sex offenders, whose diagnosed mental disorders make them likely to reoffend if released at the end of their prison terms." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 235 (*Cooley*).) To be committed, the trier of fact must find beyond a reasonable doubt that the person is an SVP. (*Id*. at p. 243.)

As noted, the SVPA defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) The People must also prove that the sexually violent criminal behavior the person is likely to

26

engage in will be predatory in nature.  (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1186.)

Before the People may file a petition to commit a person as an SVP, the Department of Corrections and Rehabilitation (CDCR) must first screen him or her, generally at least six months before his or her scheduled release date. (§ 6601, subd. (a).)  "If as a result of this screening it is determined that the person is likely to be a sexually violent predator, the [CDCR] shall refer the person to the [DSH] for a full evaluation of whether the person meets the criteria in Section 6600."  (§ 6601, subd. (b).)

Once a person is referred to DSH, he or she is evaluated under a standardized assessment protocol developed by DSH to determine whether he or she may be an SVP.  The "standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders.  Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (§ 6601, subd. (c).)

A person is initially evaluated by two mental health professionals designated by the DSH.  (§ 6601, subds. (c) & (d).)  If both evaluators concur "that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody," the DSH forwards a request for a petition for civil commitment under section 6606 to the county in which the person was convicted of the offense for which he or she is currently incarcerated.  (§ 6601, subds. (d) & (i).)  "Copies of the evaluation reports and any other supporting documents shall be made available to the attorney . . . who may file a petition for commitment."

27

(§ 6601, subd. (h)(1).) If the county's designated counsel concur with the recommendation of DSH, "a petition for commitment shall be filed in the superior court." (§ 6601, subd. (h)(1).)

"Upon filing of the petition and a request for review under this section, a judge of the superior court shall review the petition and determine whether the petition states or contains sufficient facts that, if true, would constitute probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release. If the judge determines that the petition, on its face, supports a finding of probable cause, the judge shall order that the person be detained in a secure facility until a hearing can be completed pursuant to Section 6602." (§ 6601.5.)[10]

Regardless of whether the court conducts a "paper review" under section 6601.5 (*Walker, supra,* 51 Cal.App.5th at p. 690), a person alleged to be an SVP is entitled to a probable cause hearing. (§ 6602, subd. (a).) The probable cause hearing is somewhat "analogous to a preliminary hearing in a criminal case; both serve to ' " 'weed out groundless or unsupported charges ... and to relieve the accused of the degradation and expense of a . . . trial.' " ' [Citation.]" (*Cooley, supra*, 29 Cal.4th at p. 247.)

At the probable cause hearing, the court "shall review the petition and determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory

_____

[10] "An order issued by a judge pursuant to Section 6601.5, finding that the petition, on its face, supports a finding of probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release, shall toll that person's parole pursuant to paragraph (4) of subdivision (a) of Section 3000 of the Penal Code, if that individual is determined to be a sexually violent predator." (§ 6601, subd. (j).)

criminal behavior upon his or her release." (§ 6602, subd. (a).) At the hearing, the individual is "entitled to assistance of counsel." (*Ibid.*) "If the judge determines there is not probable cause, he or she shall dismiss the petition and any person subject to parole shall report to parole. If the judge determines that there is probable cause, the judge shall order that the person remain in custody in a secure facility until a trial is completed . . . ." (*Ibid.*)

A trial is required to determine whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release from the jurisdiction of the [CDCR] or other secure facility." (§ 6602, subd. (a).) A person alleged to be an SVP is "entitled to a trial by jury, to the assistance of counsel, to the right to retain experts or professional persons to perform an examination on the person's behalf, and to have access to all relevant medical and psychological records and reports." (§ 6603, subd. (a).) If neither the person deemed to be an SVP nor the attorney petitioning for commitment demand a jury trial, "the trial shall be before the court without a jury." (*Id.*, subd. (f).) "A unanimous verdict shall be required in any trial." (*Id.*, subd. (g).)

"If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the [DSH] for appropriate treatment and confinement in a secure facility." (§ 6604.) Once a person has been found to be an SVP, the DSH must conduct annual mental health examinations, reporting to the court whether the person continues to meet the definition of an SVP. (§ 6604.9, subd. (a).) The report to the court must recommend whether unconditional discharge or conditional release to a less restrictive alternative (that would adequately protect the community) is in the person's best interest. (*Id.*, subd.

29

(b).) If the DSH does not recommend either unconditional discharge or conditional release, a person may still petition for conditional release without the recommendation or concurrence of the DSH. (§ 6608, subd. (a).)

B. *The Section 6602 Hearing Pre-*Sanchez

The SVPA is "sparse in its description of the procedural requirements for a probable cause hearing" (*Walker*, *supra*, 51 Cal.App.5th at p. 691), merely requiring the court to " 'review the petition' " and determine whether or not there is " 'probable cause' " to believe the person named in the petition is an SVP. (*Ibid.*, quoting § 6602, subd. (a).)

Before our high court decided *Sanchez* in 2016, case law dating back at least to 1998 had recognized that at a section 6602 probable cause hearing a person had more rights than a mere "paper review" of the petition, as provided in section 6601.5 (*In re Parker* (1998) 60 Cal.App.4th 1453, 1460 (*Parker*)); that a person instead had the right under section 6602 to "challenge the facts on which the petition was filed, i.e., the underlying attached experts' evaluations" (*id.* at p. 1468); and to present both oral or written evidence. (*Id.* at pp. 1469–1470.) Although the opinions of experts could be admitted through the hearsay reports of the experts, a person at the probable cause hearing also had the right to "challenge the accuracy of such reports by calling such experts for cross-examination . . . and call[ing] such other witness who, upon a proper showing, the superior court judge finds to have relevant evidence." (*Ibid.*)

Our high court in 2001 approvingly cited to *Parker* in connection with the "show cause hearing" under section 6005, applicable to a petition for unconditional release of a person committed as an SVP. (*People v. Cheek* (2001) 25 Cal.4th 894, 899 (*Cheek*).) *Cheek* construed section 6605 to grant a person the same rights to present evidence and cross-examine witnesses as

30

he or she has under section 6602, as *Parker* had found. (*Cheek*, at p. 900 [noting "[s]ection 6605, like section 6602, provides for a pretrial hearing and grants the defendant the right to be present and to be represented by an attorney at that hearing," and noting the "parallel language and function of sections 6605 and 6602 indicate that section 6605 should be construed to grant a defendant the same rights to present evidence and cross-examine witnesses as he [or she] has under section 6602"].)

In 2002, our high court addressed the "scope and substance" of a section 6602 probable cause hearing. (*Cooley*, *supra*, 29 Cal.4th at p. 235.) *Cooley* found the purpose of such a hearing was for the court to determine whether a "reasonable person could entertain a strong suspicion that the [attorney] petitioner has satisfied all the elements required for a civil commitment as an SVP." (*Id.* at p. 236.) Although section 6602, subdivision (a) describes the hearing to merely require only probable cause that a person is " 'likely to engage in sexually violent predatory criminal behavior' " upon his or her release, *Cooley* concluded the trial court in determining probable cause under this statute must consider "whether (1) the offender has been convicted of a qualifying sexually violent offense . . . ; (2) the offender has a diagnosable mental disorder; (3) the disorder makes it likely he or she will engage in sexually violent criminal conduct if released; and (4) this sexually violent criminal conduct will be predatory in nature." (*Cooley*, at p. 236.)

*Walker* recognized that in dicta *Cooley* observed that the SVPA " 'does not provide any specific procedural requirements for the probable cause hearing,' but it again endorsed *Parker*'s interpretation of the statutory requirements. (*Cooley*, *supra*, 29 Cal.4th at p. 245, fn. 8.) The Court [in *Cooley*] explained: '*Although the petitioner is allowed, despite their hearsay nature, to present the contents of any reports that form the basis of the petition*

31

*as evidence*, the alleged sexual predator is allowed to cross-examine the expert concerning the evaluation and can call the expert to the stand for that purpose. ([*Parker, supra,* 60 Cal.App.4th] at pp. 1469–1470.) The person named in the petition is thus allowed to 'challenge the accuracy' of the evaluations by experts who found that he or she met the criteria for an SVP. (*Id*. at p. 1470.)' ([*Cooley*, at p. 245, fn. 8].)" (*Walker*, *supra*, 51 Cal.App.5th at pp. 692–693.)

C. Sanchez *and Hearsay*

Hearsay is evidence of an out-of-court statement offered to prove the truth of the matter stated. Unless an exception applies, hearsay is inadmissible. (Evid. Code, § 1200, subds. (a) & (b).) We apply an "abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question [citations]." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

One exception to the hearsay rule is found in Evidence Code section 801.[11] Subdivision (b) of this statute generally permits an expert witness to base his or her opinion on matters made known to the expert, "whether or not admissible, that is of a type that reasonably may be relied upon by an expert

---

[11] This statute provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.)

in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b).)

Before *Sanchez*, another broad exception to the hearsay rule was based on the principle that "out-of-court statements offered to support an expert's opinion are not hearsay because they are not offered for the truth of the matter asserted. Instead, they are offered for the purpose of assessing the value of the expert's opinion." (*People v. Dean* (2009) 174 Cal.App.4th 186, 193.) Our high court in *Sanchez* found this principle conflicted with the rule that "an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge." (*Sanchez, supra*, 63 Cal.4th at p. 676.)

*Sanchez* thus rejected this principle, reasoning: "When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth' [citation] of the hearsay statement. If the hearsay that the expert relies on and treats as true is *not* true, an important basis for the opinion is lacking." (*Sanchez, supra*, 63 Cal.4th at pp. 682–683.)

*Sanchez* continued: "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez, supra*, 63 Cal.4th at p. 686.) The *Sanchez* court thus found that case-specific facts related by the People's gang expert to the jury concerning a defendant's gang membership were inadmissible because "[t]hey were recited by the expert, who presented them as true statements of fact, without the requisite independent proof." (*Id.* at p. 670.)

33

In contrast to case-specific facts asserted in hearsay statements, *Sanchez* noted that its "decision does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field." (*Sanchez, supra*, 63 Cal.4th at p. 685.) Thus, an "expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests. A jury may repose greater confidence in an expert who relies upon well-established scientific principles . . . . There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception." (*Sanchez*, at pp. 685–686.)

D. *The Court of Appeal Decisions in* Bennett*,* Couthren*, and* Walker

*Bennett* was the first of two cases in 2019 to find *Sanchez* applied to a section 6602 probable cause hearing to render inadmissible part of a defendant's evaluations based on case-specific facts from hearsay sources. In *Bennett*, the Court of Appeal addressed whether criminal background information stemming from a 2012 incident in which the defendant was arrested for two rape-related offenses, which charges were ultimately dropped when the victim could not be located, could be used to support the experts' determination in their evaluations, and in their testimony at the section 6602 hearing, that the defendant met the criteria of an SVP. (*Bennett, supra*, 39 Cal.App.5th at pp. 868–869).

Both experts in *Bennett* relied extensively on the 2012 incident, using police and probation reports for the descriptions of the alleged offense, an

34

incident the defendant denied during his forensic interviews. (*Bennett*, *supra*, 39 Cal.App.5th at p. 869.) One of the experts stated in his evaluation, and during his testimony at the probable cause hearing, that absent the 2012 incident—which had only led to the defendant's conviction for failing to register, a non-sexually violent offense under the SVPA—he likely would not have found the defendant was an SVP based solely on defendant's two 1986 rape convictions. (*Ibid.*) However, this same expert in his evaluation stated he " 'tend[ed] to believe the [rape] victim' " over the defendant, and therefore found the defendant's " 'rape behavior' " extended between 1986 and 2012. (*Ibid.*) The trial court, after sustaining the defendant's hearsay objection to the experts' evaluations regarding the 2012 rape incident, nonetheless found there was probable cause the defendant was an SVP. (*Id.* at pp. 872–873.)

Bennett concluded that the trial court had properly sustained the defendant's hearsay objection at the probable cause hearing because the evaluations included case-specific facts from the 2012 incident that were derived from hearsay sources, and these facts were neither proven by competent evidence nor subject to a hearsay exception. (*Bennett*, *supra*, 39 Cal.App.5th at pp. 868, 880.) In so doing, *Bennett* rejected the People's argument that the formal rules of evidence, including the hearsay rule, did not apply at a section 6602 hearing. (*Bennett*, at pp. 878, 882.) Because the case-specific facts relied on by the experts were "central" to the court's probable cause finding, the court ordered the SVP petition dismissed. (*Id.* at p. 868.)

A few months later, the Court of Appeal in *Couthren* followed *Bennett* in concluding case-specific facts in evaluations that were derived from multiple hearsay sources were inadmissible at a section 6602 hearing. (*Couthren*, *supra*, 41 Cal.App.5th at p. 1005.) In so doing, *Couthren* rejected

35

the People's argument that long-standing precedent, and that section 6602's directive that a trial court " 'review the petition,' " allowed the People to prove probable cause through the evaluations despite the experts' reliance on hearsay. (*Couthren*, at pp. 1014–1015.)

*Couthren* on the one hand recognized that SVP evaluations are typically comprehensive and based on myriad sources, including "probation and police reports, investigative reports from prosecuting agencies, court records and transcripts, face-to-face interviews with the SVP defendant, prison and hospital rule violation reports, records of arrests, convictions and juvenile dispositions, and hospital records, including staff treatment notes, medication reports, and attendance records." (*Couthren*, *supra*, 41 Cal.App.5th at pp. 1010–1011.) *Couthren* on the other hand concluded that "[e]ach level of hearsay, the expert evaluation, the police report, and the victim's statement, must fall within an exception to be admitted into evidence. (Evid. Code, § 1201.)" (*Couthren*, at p. 1011.)

As noted, *Walker* disagreed with *Bennett* and *Couthren* that a probable cause finding at a section 6602 hearing could not be based on evaluations that included case-specific facts derived from hearsay sources. *Walker* instead concluded a court reviewing evaluations at this hearing may consider hearsay within those evaluations in determining whether there is probable cause a person is an SVP. (*Walker*, *supra*, 51 Cal.App.5th at p. 686.) The court thus found substantial evidence supported the trial court's probable cause finding and denied Walker's writ petition. (*Ibid.*)

*Walker* first took up the issue of what a petition must include when a court "reviews" it at section 6602 hearing. In light of the "integral role" the experts play in the initiation of an SVP petition (*Walker*, *supra*, 51 Cal.App.5th p. 695), the court determined these evaluations "must be deemed

36

incorporated into the petition, regardless of whether the People physically attach them to the petition at the time of filing or provide them to the court under separate cover." (*Id.* at pp. 695–696.) We agree with *Walker* on this point, and note in the instant case petitioner's evaluations were both attached to the petition and provided to the court at the section 6602 hearing.

*Walker* next addressed the main issue we also face: whether a court reviewing an SVP petition and the evaluations on which it is based may "consider the entirety of an evaluation or only such portions as do not contain otherwise inadmissible double hearsay." (*Walker*, *supra*, 51 Cal.App.5th at p. 696.) The court concluded the trial court could review the entirety of the experts' evaluations in determining probable cause, reasoning as follows: "We note that the language of section 6602(a) . . . requires the trial judge to determine probable cause based on a review of 'the petition,' which we understand to include the evaluations, not just some portion of the petition and evaluations whose admissibility is independently established. But even if we conclude the language of section 6602(a) is ambiguous on this point, our analysis of the [SVPA's] structure and purpose (*Cooley*, *supra*, 29 Cal.4th at p. 247) confirms that section 6602(a) excepts the evaluations and any information contained within them from the hearsay rule, allowing the trial judge to consider the reports in their entirety." (*Walker*, at p. 696.)

For support, *Walker* relied on the dicta in *Cooley* that the petitioner attorney at a probable cause hearing " 'is allowed, despite their hearsay nature, to present the contents of any reports that form the basis of the petition as evidence.' " (*Walker*, *supra*, 51 Cal.App.5th at p. 694, quoting *Cooley*, *supra*, 29 Cal.4th at p. 245, fn. 8.)

For additional support*, Walker* turned to section 6601, the provision of the SVPA requiring two concurring psychological evaluations prior to the

filing of an SVP petition. The court recognized the number of categories of information and requirements prescribed by the Legislature that experts must consider in adhering to a " 'standardized assessment protocol.' " (*Walker*, *supra*, 51 Cal.App.5th at p. 696, quoting § 6601, subd. (c).) As we have noted, this includes " 'assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. These risk factors include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder.' " (*Walker*, at p. 696, quoting § 6601, subd. (c).)

Based on section 6001's requirement the experts include all such information in their reports, *Walker* recognized "[m]uch of this broad array of historical information will be found in hearsay sources. Indeed, the evaluations in this case reveal that both evaluators relied on a variety of hearsay sources, including court records, probation reports, Walker's record of arrest and prosecutions, and Walker's prison central file recounting incidents during his incarceration. The Legislature clearly intended for evaluators to rely on hearsay sources in their evaluations, as the alternative would be to require that evaluators reinvestigate a lifetime worth of historical information comprising the person's 'criminal and psychosexual history,' a near-impossible task for which a psychologist is ill-suited. And given that the evaluations necessarily contain considerable amounts of case-specific hearsay, the Legislature must have intended the trial judge to review this hearsay in reviewing the reports. Were this not the case, most of the historical information included in the evaluations at the Legislature's behest would be subject to exclusion." (*Walker*, *supra*, 51 Cal.App.5th at pp. 696–697.)

Because *Walker* concluded section 6602 provided an exception to the hearsay rule, it further concluded that *Sanchez* did not apply at the probable cause hearing, reasoning as follows: "As has long been understood, exceptions to the Evidence Code's rule against hearsay (Evid. Code, § 1200) may be found in statutes outside the Evidence Code, and in judicial decisions. [Citations.] We conclude that when the [SVPA] directs the superior court to 'review the petition' in determining probable cause (§ 6602(a)), the act establishes just such an exception to the hearsay rule. This exception allows—indeed requires—the trial court to consider the expert evaluations on which the petition necessarily depends, including case-specific facts obtained from hearsay sources described within the evaluations. Because these evaluations and their contents are 'covered by a hearsay exception' specific to SVP probable cause hearings, they are not subject to exclusion under *Sanchez*." (*Walker*, *supra*, 51 Cal.App.5th at pp. 694–695.)

E. *Section 6602 Is an Implied Exception to the Hearsay Rule*

We find *Walker*'s reasoning persuasive on the issue before us. We agree with *Walker* that section 6602's requirement that a trial court "review" the petition (and evaluations) in making a probable cause finding is indicative of legislative intent that this statute, when viewed in light of the SVPA as a whole, creates an implied exception to the hearsay rule, thus allowing the court to review the entirety of the evaluations in making this determination.

As summarized *ante*, Drs. Fox and Sims in their psychological evaluations of petitioner relied on broad array of historical information in adhering to the statutorily mandated "standardized assessment protocol" developed by DHS. The experts were required not only to assess petitioner for any "diagnosable mental disorders," but also for the various risk factors

39

associated with the risk of reoffense among sex offenders. (See § 6601, subd. (c).)

In completing this task, both experts each reviewed about 40 sets of documents from myriad sources, including the 2012 probation report; police reports; prison and hospital rule violation reports; criminal history records; hospital and medical records, including prior to petitioner's incarceration on the qualifying crime, when he was admitted both to Patton and Atascadero State Hospitals; and during his incarceration, when he received psychiatric treatment, including hospitalization(s) as an acute psychiatric patient.

Requiring independent proof of such historical information from these myriad sources, as a condition to its admission at the probable cause hearing, first would place an enormous burden on experts in performing their standardized assessment protocol of a person; and second on the People in having to proffer competent evidence at what amounts to an interim hearing before an SVP trial can be set. Such a requirement, if applied in the instant case, would have severely limited the information available to the court in making its probable cause determination, even if this information was highly relevant on this issue. (See *Walker*, *supra*, 51 Cal.App.5th at pp. 696–697 [requiring evaluators to "reinvestigate a lifetime worth of historical information comprising the person's 'criminal and psychosexual history,' " in order to rely on such information in their SVP evaluations, would be a "near-impossible task for which a psychologist is ill-suited"].) We thus conclude, as did *Walker*, that section 6602 is an implied exception to the hearsay rule.

We also find persuasive the point made in *Walker* that our high court in situations not unlike ours has sought to avoid duplicity in the presentation of evidence at an interim hearing (i.e., section 6602) and at a subsequent trial (i.e., sections 6003 and 6004). (See *Walker*, *supra*, 51 Cal.App.5th at p. 697,

40

citing *Conservatorship of Manton* (1985) 39 Cal.3d 645 (*Manton*).) Our high court in *Manton* reversed a conservatorship judgment because the trial court erred in admitting at trial a conservatorship investigation report containing hearsay that was properly admitted at an *interim* hearing to determine whether the proposed conservatee was gravely disabled. (*Id.*, at pp. 651–652.)

*Manton* reasoned: "If the report were admissible at both the initial hearing and a subsequent court trial, the two proceedings would be essentially identical in terms of the acceptable range of evidence to be considered." (*Manton*, *supra*, 39 Cal.3d at p. 651.) In order to avoid such redundancy, *Manton* construed legislative intent as allowing investigation reports to be admissible only at the hearing. (*Ibid.*)

The law is well settled that experts' evaluations and hearsay in them are inadmissible at an SVP *trial*. (See e.g., *Walker*, *supra*, 51 Cal.App.5th at p. 698; *People v. Yates* (2018) 25 Cal.App.5th 474 (*Yates*) [same]; *People v. Roa* (2017) 11 Cal.App.5th 428 (*Roa*) [same].) Not unlike the statutory scheme in the conservatorship statutes, the SVPA requires a court at the section 6602 hearing to "review the petition," but no such language exists in sections 6003 and 6004 governing SVP trials.

Applying the reasoning of *Manton*, we can infer a legislative intent that hearsay is admissible in a section 6602 probable cause hearing where the court "reviews" the petition and the experts' evaluations. Otherwise, the interim section 6602 hearing and the SVP trial—where hearsay is not allowed—would be nearly "identical in terms of the acceptable range of evidence to be considered," a conclusion *Manton*, albeit under the conservatorship statutes, sought to avoid absent "clear legislative intent to the contrary." (See *Manton*, *supra*, 39 Cal.3d at p. 651; see also *Walker*,

*supra*, 51 Cal.App.5th at p. 698 [relying on *Manton* in finding it "highly unlikely the Legislature intended for a prosecutor to procure independent evidence for the vast amount of case-specific hearsay information contained in a psychological evaluation—including criminal history, familial and relationship history, medical information, and a defendant's prison disciplinary record—at a probable cause hearing, and then again at a subsequent trial"].)

For the foregoing reasons, we agree with *Walker* and disagree with *Bennett* and *Couthren* in concluding section 6602, when viewed in light of the SVPA as a whole, impliedly allows a court at a probable cause hearing to consider hearsay in the neutral experts' evaluations when making a probable cause determination.

As a result of our decision, we conclude that *Sanchez* is inapplicable at a section 6602 probable cause. We also conclude the People did not waive (or, more appropriately, forfeit) any potential hearsay objection under section 6602 by failing to raise it at the probable cause hearing, as petitioner contends, inasmuch as our decision derives from construction of section 6602 and presents a question of law that we have now resolved against petitioner. (See *People v. Tran* (2015) 61 Cal.4th 1160, 1166 [noting questions of statutory interpretation are reviewed de novo].)

F.  *Substantial Evidence Supports the Trial Court's Probable Cause Finding*

Considering the evaluations of Drs. Fox and Sims in their entirety, we conclude the court's probable cause finding is supported by substantial evidence.  Petitioner's conviction for a violation of Penal Code section 288, subdivision (a) in 2012 constituted a "sexually violent offense."  (See §§ 6600, subd. (b) & 6600.1 [providing:  "If the victim of an underlying offense that is specified in subdivision (b) of Section 6600 is a child under the age of 14, the offense shall constitute a 'sexually violent offense' for purposes of Section 6600"].)

Petitioner was also found to have a "diagnosed mental disorder."  (See 6600, subd. (c).)  Drs. Fox and Sims both found he suffered from Pedophilic Disorder among other disorders, and both found this condition affected petitioner's emotional or volitional capacity that predisposes him to the commission of criminal sexual acts.

Indeed, the evaluations show that petitioner groomed seven-year-old Jane Doe in connection with his qualifying offense by buying her "underwear and toys" and giving her a sexually explicit doll.  In addition, when deputies searched petitioner's RV located adjacent to the trailer where Jane Doe lived, they found images of "child erotica, notebooks with handwritten text discussing child sex and an intention to engage in sex with children, literature discussing sex with children in foreign countries, and baby dolls with red paint on their vaginal areas."  Also found in petitioner's possession at the time of commission of the qualifying crime were videos titled, by way of example only, " '6-9 years.  Girls Fuck.  Little Cunts.  Fucked by big daddy.  Rape little girl' " and "Hot 8 yrs old getting pussy fucked by old dude.[ ] etc. . . ."

43

After his arrest, petitioner sought to purchase, and eventually did purchase after making bail, child pornography from the undercover agent. Petitioner at the same time made plans to travel to Mexico with the agent to have sex with children, claiming he was hoping to have a "real" relationship with an 11-year-old girl, whom he could "fuck" after paying off the girl's mother. Petitioner also admitted to the agent that he was a "molester" and "pervert" and he would "protect" others just like him; and that his daughter had "sucked [his] dick when she was like eight years old."

When questioned by Dr. Sims about "Don Ramon," petitioner claimed his intention in buying the child pornography videos from the agent, and agreeing to travel with this individual to Mexico to have sex with children, was all part of his plan to "entrap" this individual; and that petitioner gave a similar story when asked by Dr. Sims about journals found in petitioner's possession that referenced sex with children, claiming his intention was to "infiltrate" a group of child molesters in Ocotillo by acting like one of them.

Additional evidence to support the finding petitioner has a diagnosable mental disorder of pedophilia stems from petitioner's incarceration. In 2011, during a routine inspection deputies found papers and drawings in petitioner's cell. Dr. Fox reviewed the drawings. He noted one of the drawings displayed a "a female with her legs spread open and a caption of her saying, 'Fuck me hard daddy!' Underneath the image is the quote, 'Seems he has a daughter that just loves to fuck.' " Another drawing/writing of petitioner provided, " 'Little girls inside of blacked out minivans in Lost Angelles Cal. Arcade Fun!' "

As also summarized in the evaluations, there were myriad references to petitioner suffering from schizophrenia. Petitioner also admitted to Dr. Sims during the forensic interview that he suffered from this condition. Both

doctors opined petitioner suffered from Schizophrenic Disorder, which contributed to their opinion he had a "diagnosed mental disorder" under section 6600, subdivision (c).

Both evaluators found petitioner's mental disorders affect his emotional and/or volitional capacity predisposing him to commit criminal sexual acts. The evaluators noted petitioner committed the qualifying crime against Jane Doe while on community supervision. They also noted that even after he was charged with multiple counts including lewd act on a child under the age of 14, while out on bail petitioner purchased child pornography from the undercover agent and made plans with the agent to travel to Mexico to have sex with children. And, despite the potential for being caught and sanctioned, petitioner while incarcerated in 2011, 2012, and 2015 was found to be in possession of writings and drawings of a sexual nature involving prepubescent females.

Both evaluators concluded from their review of myriad medical and psychiatric records that petitioner was psychologically unstable. Dr. Fox noted petitioner's lack of compliance in taking his antipsychotic medication, which required a court order and was given intramuscularly. Dr. Sims noted petitioner on multiple occasions attempted suicide, including during his incarceration on the qualifying crime. Petitioner also admitted attempting suicide during his interview with Dr. Sims. Both evaluators noted petitioner's medical and psychiatric history showed he suffered from auditory hallucinations, paranoia, and disorganization. Petitioner during his interview with Dr. Sims also admitted "at times" to having auditory hallucinations. And both evaluators noted petitioner's extensive criminal history, his inability to conform to social norms and behave lawfully, his

45

sporadic work history, and his lack of remorse for his sexual acts against Jane Doe and other victims.

In addition, Dr. Fox found petitioner's Static-99R score placed petitioner in the above average risk category for being charged or convicted of another sexual offense. As summarized *ante*, Dr. Fox also found multiple factors in the VRS-SO assessment suggested that if left untreated, petitioner was likely to engage in sexually violent criminal behavior as a result of his disorders.

Although Dr. Sims found petitioner's Static-99R and Static-2002 scores placed petitioner in the average risk category for being charged or convicted of another sexual offense, in assessing petitioner under the structured risk assessment—forensic version, Dr. Sims opined petitioner's score placed him at a "high" level of psychological need. Among other factors summarized *ante*, Dr. Sims found the factor for sexual preference for children applied to petitioner, based not only on his conviction under Penal Code section 288, subdivision (a) in the qualifying crime, but also on his repeated interest in engaging in sexual activity with prepubescent females.

Finally, both experts concurred that if left untreated or absent custody, petitioner's sexually violent criminal behavior will be predatory in nature. Both evaluations noted petitioner's qualifying crime was "predatory" (see § 6600, subd. (e)), as Jane Doe was a person of casual acquaintance with whom petitioner had no substantial relationship, and the primary purpose of his relationship with Jane was sexual victimization. (See *ibid.*)

We reiterate our decision in this case—that hearsay in the psychological evaluations of a person may be considered by the court in its "review" of an SVP petition—is limited to the probable cause hearing in section 6602. The People at an SVP trial may *not* satisfy their evidentiary

46

burden by relying on hearsay, unless independently proven by competent evidence or covered by a hearsay exception.  (See *Walker*, *supra*, 51 Cal.App.5th at p. 702; *Yates*, *supra*, 25 Cal.App.5th at p. 476; *Roa*, *supra*, 11 Cal.App.5th at pp. 452-453.)

## DISPOSITION

The petition is denied.

BENKE, Acting P. J.

WE CONCUR:


HUFFMAN, J.


AARON, J.

47